## G. J. George, Trustee, Appellant, v. Walter L. Pfeil et al., Appellees.

PARTNERSHIP—*jurisdiction of chancery.* Chancery has exclusive jurisdiction with respect to partnership accounting and no claim can be urged by way of set-off or as the basis of an independent action which would require a court of law to enter into a partnership accounting.

Assumpsit. Appeal from the Circuit Court of Cass county; the Hon. HARRY HIGBEE, Judge, presiding. Heard in this court at the November term, 1909. Reversed and judgment here. Opinion filed October 18, 1910.

BARBER & BARBER and MILLS & NEIGER, for appellant.

MILTON McCLURE, for appellees.

MR. JUSTICE BAUME delivered the opinion of the court.

This is a suit in assumpsit by G. J. George, trustee of the estate of Henry Bridgman, bankrupt, against Walter L. and George W. Pfeil, partners as Pfeil Brothers, to recover the amount due upon a promissory note bearing date March 1, 1895, for $1,403, payable one year thereafter with interest at 7 per cent per annum from date. The defendants pleaded the general issue and payment in general terms, and gave notice under the general issue of set-off in substance as follows:

(1) To merchandise purchased from February, 1896, to May 21, 1907, for family supplies, as per bill of particulars attached ...............................$1,017.69

(2) Interest on said bill from January 1, 1901, average date of purchase......... 569.84

(3) Two-thirds of grocery stock taken over by H. A. Bridgman, estimated at 80 per cent of invoice price of $600.00......... 320.00

(4) Interest on last item from September 15, 1895 ............................ 293.00

(5) Two-thirds of $919.47 in accounts and notes collected by H. A. Bridgman, or transferred to his account, being assets of Bridgman, Pfeil & Co., as shown by bill of particulars thereof attached..... 612.98

(6) Interest on accounts and notes collected and transferred to H. A. Bridgman from March 1, 1897, average date of collection 502.50

(7) Estimated balance of principal and interest on Wm. Neibold note, signed by Pfeil Bros. as surety, wrongfully negotiated by H. A. Bridgman............. 113.50

Total............$3,429.51

Appended to said notice of set-off is a statement to the effect that in addition to the note sued on the said bankrupt was entitled to credit on said set-off account as follows:

One-third net assets from general store taken over by Pfeil Bros. February 1, 1896, after equalizing overdrafts of partners ............................$ 480.17

Interest on same................... 436.95

The note bore endorsements of the payment of interest for each of the several years from 1895 to 1905 inclusive, and also of payments of $208 on November 11, 1907, and $201.86 on December 26, 1907. The trial of the cause by the court without a jury resulted in a finding and judgment in favor of the plaintiff and

against the defendants for $57.07, from which judgment the plaintiff has prosecuted this appeal.

Upon the trial the defendants disclaimed all of the endorsements of interest upon the note and denied that they ever paid interest or authorized Bridgman to credit any interest thereon. The defendants also abandoned the seventh item of their set-off.

It was admitted by the defendants that the two payments of $208 and $201.86 endorsed on said note were made by them to the First National Bank of Beardstown which held the note as collateral for a loan of $400 to Bridgman and which payments liquidated the amount due from Bridgman to said bank.

The uncontroverted facts in the case are substantially, as follows: Prior to September 15, 1895, Bridgman and the defendants as equal partners, conducted a general merchandising business at Arenzville under the firm name of Bridgman, Pfeil & Co. On that day by mutual agreement of all the partners an inventory was taken of the grocery stock which was kept separate and apart from the other merchandise, and Bridgman thereafter assumed exclusive charge of and conducted the grocery business on his own behalf, continuing however as partner with the defendants in the dry goods and clothing business until February, 1896, when the defendants with the consent of Bridgman took over the stock of clothing and dry goods and thereafter conducted that branch of the business on their own behalf under the firm name of Pfeil Brothers. At the time the defendants took over the stock of clothing and dry goods no inventory thereof was taken, the last preceding inventory having been taken on January 1, 1896. After such practical although informal dissolution of the original partnership the defendants retained the partnership books, collecting some of the accounts, taking notes payable to the original partnership in liquidation of other accounts, and paying most of the indebtedness of the original partnership. A portion of the accounts owing to the orig-

inal partnership was taken and collected by Bridgman who kept a portion of the proceeds and deposited a portion with the defendants. No settlement of the partnership business was ever had between Bridgman and the defendants and it has never been agreed or determined how much Bridgman owed to the defendants or they owed to him for the stock of merchandise or any part thereof, or for the notes and accounts due to the partnership, or for the indebtedness of the partnership paid by them or him. From February, 1896, when the defendants took over the stock of clothing and dry goods until November, 1907, Bridgman purchased from them upon an open account merchandise as family supplies to the amount of $1,017.69, which amount the plaintiff concedes to be a proper item of set-off against his claim upon the note, but plaintiff contests all the other items of set-off claimed by the defendants.

The method adopted by the trial court in arriving at its finding as to the amount due upon the note is not wholly clear. Counsel for defendants suggests that such finding was arrived at by allowing to the defendants a credit of $320 as of September 15, 1895, for the stock of groceries then taken over by Bridgman, and by allowing to the defendants monthly credits for the merchandise account for family supplies purchased by Bridgman. It is conceded by defendants that the court refused to allow by way of set-off as a credit upon the note the item of $612.98, being two-thirds of the amount of partnership accounts and notes transferred to and collected by Bridgman, on the note, because the same arose out of an unsettled partnership account, and to the action of the court in refusing to allow said item of set-off no cross error has been assigned.

The only substantive evidence in the record bearing upon the defendants' claim of set-off here involved is the testimony of the defendant W. L. Pfeil, which is, in substance, as follows:

"No direct payments were ever made on the note except those endorsed by Mr. Condit, which were $208, on Nov. 11, 1907, and $201.86 on December 26, 1907. We never made any other payments on the note. We never authorized Mr. Bridgman or anybody else to make any of those endorsements of interest. The note was at the National Bank of Beardstown when we made these two payments. They notified me that they held the note for collection. As we had no final settlement of our business relations, I thought likely I might possibly owe him that much and without going into details of the matter thoroughly, I made those two payments. After the execution of this note on March 1, 1895, we were together doing a partnership business in general merchandise, the stock consisting of clothing, dry goods and groceries. On September 5, 1895, we turned the stock of groceries over to Bridgman by an agreement of us three. An invoice of the grocery stock was taken by all three members of the firm. I could not give the exact figures of the total invoice of the stock of groceries turned over to Bridgman, but it was $587 and something, and there was a scales and a few things that we hadn't determined what they would be worth. Mr. Bridgman, myself and my brother were present when the invoice of this grocery stock was taken. There was no agreement as to the invoice of the stock. It was to be as usual. I don't remember of anything being said as to the discount at that time or at any time and there was nothing said afterwards as to the clothing or dry goods. It is a question as to what I claim as the usual discount on the stock of groceries. Some stocks are more than others. In my judgment I would think 75 cents on the dollar, taking it all round. The stock outside of the three items which were not put down amounted to $580 and something. I have no memorandum to which I can refer outside of these figures. I have the total of the grocery stock taken by Bridgman in the book; it is $587.66; that didn't include two scales, two tanks and one show case. My estimation of the value of those five articles would be $15 or $18, or something like that. After the stock of groceries had been taken

over by Bridgman, the stock of clothing and dry goods remained about the same until the first part of February, 1896, when I talked to Bridgman with regard to the matter and told him I would take the stock of clothing and assume all the obligations of the firm and turn over the accounts to be credited on my indebtedness. There was nothing further done then. In January, 1896, an invoice was taken by different ones of the firm, the same as the grocery stock. We were simply taking it at that time. We had no thought of the dissolution; only we usually took invoice every year. We had been doing that. On January 1 we usually took an invoice, and we took that inventory and had spoken of changing the members of the firm in order to straighten up our accounts. On February 8, 1896, I mentioned I would take the clothing stock and assume all obligations and turn over accounts to him to be applied on the indebtedness and that was agreed so far as I was concerned. It was satisfactory to us. We acted on that proposition. We had made the invoice before that time. The three of us made it, but particularly I and my brother; the record was preserved of that invoice. At the time in February, 1896, the stock was taken on the basis of that invoice. At the time the invoice was taken we had not decided on a dissolution, but when we did decide on a dissolution the stock was taken over on the basis of the invoice. There was no discussion about discount. As to condition, it was just a stock of clothing, shoes, dry goods and gent's furnishings; perhaps some of it was seven or eight years old. The different items were all marked. Part of it was shelf-worn. In my judgment a reasonable and fair discount on the prescribed value of the stock would be about 30 per cent. The invoice was made on the actual cost price, the total amount of the invoice of that stock on January 1, 1896, was $5,754.90. On February 1, 1896, the invoice of the stock of dry goods and clothing taken over by myself and brother at the full cost price was $5,455.50.''

On his cross-examination the same witness testified as follows:

''On September 15, 1895, Bridgman took charge of

the grocery store and stock and from that time my brother and I had nothing more to do with it. At the time Bridgman took charge of the grocery stock in his own behalf, no agreement was made by him as to just how much he would pay me and my brother for our interest in the groceries or the accounts, nor how much the stock would be discounted in estimating how much would be coming to us. Neither at that time nor any later time did we have any agreement as to how much money we would have. At the time he took those things over we expected to have a settlement and adjust those things at a later time. After September 15, 1895, Bridgman continued with us as partner in the dry goods and clothing business, and about February 1, 1896, myself and brother took exclusive charge of the clothing and dry goods store. We agreed on dissolution, but we never had come to any conclusion with Bridgman with regard to prices on the merchandise.

"Q. The Court: Do you mean the grocery store or clothing store?

"A. All of them.

"About the same time Bridgman took a lot of accounts and collected them, and we took some of the accounts and collected them. Our portion of the accounts he collected should be credited on the note he had against us. In our settlement these matters were to be adjusted. At a future time we intended to have an adjustment with regard to the business and all accounts. We (Pfeil Bros.) tried to have that settlement and adjustment and wanted to, but found we would have to have proceedings against him for adjustment. We never had any final settlement. We never had a final settlement with regard to the accounts nor agreed on how much we owed him or he owed us."

At the close of the evidence in the case there appears in the record a stipulation as follows:

"It is further stipulated and agreed by and between the parties hereto that there never was any final accounting or settlement of the firm of Bridgman, Pfeil & Co.; that there was no balance struck of their partnership matters, and no promise by either of the partners, or any of the partners, to the other or others of any balance due."

The only propositions of law held by the court as the law of the case were submitted by the plaintiff and are as follows:

"1.    In actions of assumpsit, the defendants cannot set-off or recoup against the demand of the plaintiff, any claim against the plaintiff or the bankrupt whom he represents, arising out of a partnership formerly existing between the plaintiff, or the bankrupt whom he represents, and the defendants, until a final accounting and settlement of all the accounts of said partnership has been made, a balance struck and the plaintiff, or the bankrupt whom he represents, has promised to pay such balance to the defendants."

"2.    The court holds as a matter of law that one partner cannot maintain an action at law against his co-partner, either in an original suit or by way of set-off, upon any transaction relating to the partnership business, unless and until there has been a final accounting and settlement of all the partnership matters, a balance is struck and a promise to pay such balance."

That the propositions so held by the court accurately state the law relating to partnership accounts is not controverted by defendants and is sustained by the authorities. Burns v. Nottingham, 60 Ill. 531; Chadsey v. Harrison, 11 Ill. 151; Davenport v. Gear, 2 Scam. 495.

The defendants cannot assert by way of set-off against the plaintiff a claim for the recovery of which they could not bring an independent action at law. Litch v. Clinch, 136 Ill. 410.

The only item in defendants' claim of set-off which is proper to be considered and applied as a credit upon the note is that of $1,017.69 for merchandise purchased by Bridgman from February, 1896, to May 21, 1907, for family supplies.

In the absence of any evidence of either an express or implied agreement by Bridgman to pay interest on said open-account and in view of the fact that the amount of said open account should be credited upon

the note either monthly or annually as the same accrued there is no basis for the claim of $569.84 for interest on said open account. The third, fourth, fifth and sixth items of set-off relate to claims together with interest thereon arising out of wholly unsettled partnership transactions and accounts not cognizable in this action.

The detailed statement of defendants' first item of set-off being for family supplies sold to Bridgman does not show the items involved so that it is practicable to allow credit therefor upon the note in monthly installments, but the same may be properly allowed by an application as of March 1st of each year following March 1, 1895, the date of the note. While the evidence does not disclose the time when, or the basis upon which, interest was endorsed as paid upon said note from 1895 to 1905, the only reasonable conclusion to be arrived at is that the open store account as it ran from year to year was endorsed annually upon said note as in payment of the accrued interest thereon. The contention of the defendants that said endorsements of interest should be held to have been made up of the amount of the grocery stock taken by Bridgman on September 15, 1895, at the approximate amount of $320, and the sum of $612.98, being the approximate amount of the partnership notes and accounts received and collected by Bridgman, appears to be wholly untenable. It is altogether improbable that either of said amounts was utilized by Bridgman in making the endorsements of interest paid, because he would thus have been required to anticipate that no part of the principal of said note would be paid within a period of two years after its maturity, and because the amount realized by Bridgman from the collection of the partnership notes and accounts which were turned over to him was not ascertained and was not available for the purpose of making such endorsements at the time when they are claimed by the defendants to have been made.

Applying the open account for family supplies as a set-off against said note by crediting the same as of March 1 of each year during its continuance, and giving the defendants credit for the payments on said note as heretofore indicated of $208 on November 11, 1907, and $201.86 on December 26, 1907, there was due on said note from the defendants at the time of the hearing and judgment in the court below $1,282.95, for which amount there should have been a finding and judgment in said court in favor of the plaintiff and against the defendants.

The suggestion made on behalf of defendants that such a finding against them in this case will necessarily work a great hardship and injustice, loses its force when it appears, as it must, that the result is arrived at by the application to the undisputed facts of firmly established principles of law and that such result could have been easily avoided by the defendants, if, instead of sleeping upon their rights, they had invoked the aid of the proper forum in apt time.

A jury having been waived below and the cause by agreement tried by the court, such waiver of trial by jury extends to the review of the judgment in this court so as to enable this court to determine the issue of fact and enter final judgment. Manistee Lumb. Co. v. Union Nat. Bank, 143 Ill. 490; Everts v. Lawther, 165 Ill. 487; Osgood v. Skinner, 186 Ill. 491; Iroquois v. Elplricke, 200 Ill. 411.

The judgment of the Circuit Court will be reversed and final judgment entered in this court in favor of the plaintiff and against the defendants for $1,282.95 as of the date of October 6, 1909, together with costs of suit.

*Reversed and judgment here.*